IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AUG 26 2024

FILED

| | | |
|---|---|---|
| ASHLEY BROWN MUNOZ, as surviving daughter and as the administrator of the Estate of Jerry Lee Brown, and JAMES NEWT BROWN, as surviving son, | * * * * * * | |
| | * | CV 322-175 |
| Plaintiffs, | * * | |
| v. | * * | |
| JESSICA ASKEW, individually, | * * | |
| Defendant. | * | |

ORDER

Presently before the Court is Defendant Jessica Askew's motion for summary judgment on Plaintiffs' claim of deliberate indifference under 42 U.S.C. § 1983. Upon review of the parties' briefs, the record evidence, and the applicable law, Defendant Askew's motion for summary judgment is **DENIED** for the reasons stated below.

## I.  FACTUAL BACKGROUND

In viewing the evidence in the light most favorable to Plaintiffs, the relevant facts in the case are as follows.

Plaintiffs Ashley Brown Munoz and James Newt Brown are the surviving children of Jerry Lee Brown, who died at Johnson State

Prison in Wrightsville, Georgia on the morning of November 12, 2020. There is no dispute that Mr. Brown died at the hands of his cellmate, Charles Thomas White.

Defendant Jessica Askew is a corrections officer who was assigned to guard the G dormitory where Mr. Brown was housed. The G dormitory is divided into two open dorms designated as G-1 and G-2. The inmates are allowed to go outside of their cells to move about the dorm during the day, but at night they are locked inside their cells. G-1 and G-2 are in the same building but are separate dormitories walled off from one another. To travel from G-1 to G-2 without exiting the building to the outside, Officer Askew had to go through a staff bathroom and office. A corrections officer could not see or hear what was happening in G-1 if she were in G-2, and vice versa. (Pls.' Resp. to Def.'s St. of Material Facts, Doc. No. 34, ¶¶ 1, 7-9.)

Officer Askew's shift was from 6:00 p.m. on November 11th to 6:00 a.m. on November 12th. She was the only officer assigned to G-1 and G-2 that evening, though other officers were available within the prison if she had called for help on her handheld radio or on one of the phones located either in the center of each dorm or in the staff office. (Id. ¶¶ 3-5; Dep. of Jessica Askew, Doc. No. 34-3, at 13-16.) As part of Officer Askew's duties, she was to conduct "rounds" every 20 to 30 minutes, during which she would go up to each individual cell door with a flashlight and look through the window in the cell door to check on the cell occupants.

2

(Askew Dep. at 22 ("You walk around and look in the doors . . . to make sure that they're safe . . . and that they're in the bed.") Periodically, she also had to "count" the inmates as she conducted her rounds, which means she had to "see the body" of the inmate. (Id. at 51-55, 57-58, 127.)   Between rounds, Officer Askew testified that she would pace constantly throughout the G dormitory and would only sit down twice during a shift to eat in the staff office.   (Id. at 82-84.)

During her shift that evening, Officer Askew conducted rounds and inmate counts in both G-1 and G-2.  Logbooks show that Officer Askew made rounds in G-2, where Mr. Brown was housed, at 2:00 a.m. and 2:30 a.m.   These rounds took six minutes because the G-1 logbook indicates that Officer Askew made rounds in G-1 at 2:06 a.m. and 2:36 a.m.  At 3:00 a.m. Officer Askew performed an inmate "count."  The logbook indicates that Officer Askew called in the inmate "count" to her sergeant for G-2 at 3:08 a.m. and for G-1 at 3:17 a.m.   Officer Askew made rounds in G-2 again at 3:38 a.m. and 4:06 a.m., this time taking nine minutes and ten minutes respectively. At 5:30 a.m., Officer Askew performed another inmate count, calling in her count for G-2 at 5:38 a.m. and for G-1 at 5:43 a.m.   Thus, Officer Askew was in the G-2 dorm on rounds at 2:00 a.m., 2:30 a.m., 3:08 a.m., 3:38 a.m., 4:06 a.m. and 5:38 a.m.  (Pls.' Resp. to Def.'s St. of Material Facts ¶ 11.)

As was routine, the cell doors in G-2 were unlocked at approximately 5:38 a.m. once Officer Askew called the count into

3

her sergeant. (Id. ¶ 12.) At 5:43 a.m., Officer Askew advised her sergeant that the power had gone out in the dorms.[1] (Id. ¶ 13.) When Kierra Wilcher, the corrections officer assigned to the next shift, arrived at the prison, she was instructed to take the keys to the breaker box room to Officer Askew. (Wilcher Dep. at 25-26.) Officer Askew went to the breaker box room, which is located outside of the G building, upon Officer Wilcher's arrival at 6:10 a.m. while Officer Wilcher stayed inside the dormitory. When the lights were "flipped on," Officer Wilcher heard an inmate exclaim, "that man dead." (Id. at 26.) Officer Wilcher observed inmates standing by a closed cell door upstairs (specifically, cell G-2-241, Mr. Brown's cell); she called for assistance but stepped to the outside door to meet Officer Askew upon her return to the G dormitory. (Id. at 26, 30, 32.) (See also Pls.' Resp. to Def.'s St. of Material Facts ¶¶ 12-22.)

---

[1] This event is not recorded in a logbook and an inmate, Brandon Pendleton, testified that his electric lamp did not go out. (Dep. of Brandon Pendleton, Doc. No. 34-4, at 24.) Yet, Pendleton's cellmate, Nathan Acosta, remembered a power outage in the morning "after everything." (Dep. of Nathan Acosta, Doc. No. 28-4, at 22.) Moreover, Officer Kierra Wilcher's recall of the events upon her arrival, including the power outage, is in line with Officer Askew's testimony. (See Dep. of Kierra Wilcher, Doc. No. 34-5, at 25-27 (confirming that upon her arrival at 6:10 a.m., the power to the G dormitory was out).) Thus, the fact that the lights went out is largely undisputed as only Inmate Pendleton does not believe his lamp went out. This discrepancy, however, is of little moment since the relevant events to the issue of deliberate indifference had occurred prior to 5:43 a.m.

4

Officer Askew went to cell G-2-241 and found Mr. Brown on the floor with Inmate White standing over him; Mr. Brown was tied up, bloody, and non-responsive but still alive. (Askew Dep. at 71, 90; Askew Decl., Doc. No. 28-3, ¶ 22.) Officer Askew called the main control room for assistance and opened the door. While she waited for assistance to arrive, Inmate White started throwing clothes and other objects around the cell. Inmate White also picked up Mr. Brown and slung his body around in a violent manner. (Askew Dep. at 90-91; Askew Decl. ¶ 25.)

Once medical personnel arrived, they began performing chest compressions on Mr. Brown. He was then pronounced dead by the coroner.[2] (Askew Dep. at 73; Askew Decl. ¶¶ 27-29.) The autopsy report shows that Mr. Brown had suffered a 4½ inch stab wound in his right eye with a blue plastic object; a 3½ inch stab wound in his right ear with a metallic object; a "cluster of blunt impact injuries" to the right side of his face and scalp; "scattered blunt impact injuries" to the left side of his face; additional contusions and abrasions to his head and neck; fractured maxilla bone; multiple abrasions to his torso, particularly his back; multiple abrasions and contusions to his legs, including a "2 inch linear cluster of superficial punctate abrasions of the anterior left lower leg"; and fragments of white cloth were tied to his ankles. (Doc. No. 43-2.) The stab wounds to the head,

_____

[2] The coroner was already on site because of another inmate death that night. (Wilcher Dep. at 69.)

particularly the penetrating stab to the eye, caused Mr. Brown's death. (Id.)

The two inmates in the cell immediately adjacent to Mr. Brown's cell were deposed in the case. Inmate Nathan Acosta testified that he woke up some time between 3:00 and 4:00 a.m. (Dep. of Nathan Acosta, Doc. No. 28-4, at 11.) He heard "pretty intense" sounds coming from Mr. Brown's cell, like "somebody was throwing a bowling ball around the room" and like "two people were fighting to the death." (Id.) He testified that these fighting sounds lasted for two hours though the sounds were "on and off." (Id. at 11-12, 21.) He stated: "[T]hey would fight for a couple of minutes and then stop, and then fight for a couple of minutes and stop." (Id. at 31.) Inmate Acosta did not hear anyone cry for help, but he did hear crying or sobbing after all the sounds stopped. (Id. at 20, 25.) Inmate Brandon Pendleton testified that he woke up at 4:15 a.m. to the sound of people "fighting for their life." (Dep. of Brandon Pendleton, Doc. No. 34-4, at 10-11.) He testified that he heard a sound like a "head hit the concrete, like how you hit the bowling ball before you throw it down the lane." (Id. at 11.) He stated that the fighting did not stop until 5:17 a.m. (Id.) Inmate Pendleton was present when Officer Askew opened the cell door. He related that Inmate White tried to throw Mr. Brown out of the cell like garbage. (Id. at 19.) He described Inmate White as "flipping out" and on

6

methamphetamines.  (Id. at 18.)  He further testified that the cell was bloody and messy.  (Id. at 21.)

It is undisputed that prior to the early morning hours of November 12, 2020, Officer Askew had no knowledge that Inmate White posed a risk of harm to Mr. Brown.  (Pls.' Resp. to Def.'s St. of Material Facts ¶ 41.)

In describing Mr. Brown's injuries to the Court, Plaintiffs use words such as "brutalized body," "severe mutilation," and "blood covered cell," to which Defendant takes exception because these words are not in any testimony.  (Def.'s Resp. to Pls.' St. of Additional Facts, Doc. No. 42, ¶¶ 17, 34.)  Plaintiffs also describe Mr. Brown as "hog-tied" and "stabbed numerous times with multiple shanks," to which Defendant objects because these words are not in the autopsy report.  (Id. ¶ 18.) Nevertheless, photos of Mr. Brown's lifeless body and the condition of the cell are in the record.  (Doc. No. 43.)  Defendant suggests that the level of blood and chaotic disarray in the cell was only caused by Inmate White once the cell door was opened and he began throwing things (including Mr. Brown's dying body) around.  But there are other aspects of the bloody photographs and autopsy report, such as the binding on Mr. Brown's hands and feet, the plastic object in his right eye, the shank in his right ear, and the number of contusions and abrasions all over his body, that did not occur in the moments after the cell door was opened.  The Court recounts these particulars for this reason:  A reasonable jury could determine

7

that Mr. Brown suffered a horrific, tortuous, and brutal attack that lasted, even if intermittently, for some time the morning of November 12, 2020.

## II.   SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The purpose of the summary judgment rule is to dispose of unsupported claims or defenses, which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322—24 (1986).   Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.   "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252; accord Gilliard v. Ga. Dep't of Corrs., 500 F. App'x 860, 863 (11th Cir. 2012) (per curiam).   Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in its pleadings. Rather, [his] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby,

8

911 F.2d 1573, 1576—77 (11th Cir. 1990).  As required, this Court will view the record evidence "in the light most favorable to the [nonmovant]," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will "draw all justifiable inferences in [Plaintiff's] favor."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal quotation marks omitted).

The Clerk gave Plaintiffs notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default.  (Doc. No. 29.)  Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  The matter has been fully briefed and is ripe for adjudication.

### III.  LEGAL ANALYSIS

Section 1983 creates a private right of action for the deprivation of federal rights by persons acting under color of state law.  42 U.S.C. § 1983.  In this case, Plaintiffs claim that Officer Askew violated the constitutional rights of their decedent, Mr. Brown, to be free from cruel and unusual punishment under the Eighth Amendment.  Officer Askew contends that she is entitled to summary judgment because the evidence, even when viewed in the light most favorable to Plaintiffs, does not show that she

knew Mr. Brown was being attacked on the morning of November 12, 2020.

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "A prison official violates the Eighth Amendment when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (internal quotation marks omitted); see Wade v. McDade, 106 F.4th 1251, 1261-62 (11th Cir. 2014) (clarifying the elements of a deliberate indifference claim under Farmer v. Brennan). Thus, to survive a motion for summary judgment, a plaintiff must show: "(1) a substantial risk of serious harm; (2) the defendant['s] deliberate indifference to that risk; and (3) causation." Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019).

At summary judgment, Officer Askew challenges the second element-deliberate indifference to a known risk. Deliberate indifference is a subjective component, inquiring into the *mens rea* of the defendant. That is, to violate the Eighth Amendment, an official must have a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834 (quoted source omitted). The *en banc* Eleventh Circuit Court of Appeals recently resolved a "deep and entrenched intracircuit split" regarding the subjective element of an Eighth Amendment deliberate indifference claim in Wade v.

McDade, 106 F.4[th] 1251, 1254 (11th Cir. 2024). Drawing from the Supreme Court's decision in Farmer v. Brennan, the Wade court held that the correct *mens rea* standard for all deliberate indifference cases is "subjective recklessness as used in the criminal law." Id. at 1262 (quoting Farmer, 511 U.S. at 839). To meet this standard, a plaintiff must show that the defendant "actually knew that [her] conduct-[her] own acts or omissions-put the plaintiff at substantial risk of serious harm." Id. at 1253. The Wade court added that if a defendant responds reasonably to a risk, even a known risk, she cannot be found liable under the Eighth Amendment. Id. at 1253, 1262.

In this case, Officer Askew contends that Plaintiffs have no evidence that she actually knew Mr. Brown was at serious risk of harm from which she had to protect him. She relies upon Goodman v. Kimbrough, 718 F.3d 1325 (11th Cir. 2013), for the proposition that "absent proof of knowledge that an assault was occurring and failure to act in response, there [can be] no deliberate indifference." (Def.'s Br. in Supp. of Summ. J., Doc. No. 28, at 8.) In Goodman, the plaintiff was also severely beaten by his cellmate during the night. However, the evidence in Goodman showed that the defendant officers failed to perform head counts and hourly cell checks. The defendant officers also deactivated an inmate's call button because they believed the inmate was simply requesting the use of a telephone. Because of these actions, the defendant officers did not learn of the assault until the next

11

morning.   718 F.3d at 1330.   The Eleventh Circuit held that the plaintiff failed to show deliberate indifference because he failed to produce evidence that the defendant officers "actually knew" that the assault was occurring and failed to respond reasonably to stop the assault.  Id. at 1334 (stating that "no evidence presented would support a reasonable jury's finding that [the officers] harbored a subjective awareness that [the plaintiff] was in serious danger while in his cell").

Relying upon Goodman, Officer Askew claims that she similarly did not know about Mr. Brown's assault until the next morning. She points out that the neighboring inmates testified that though there were loud sounds of fighting, the sounds were intermittent and that no witness has put Officer Askew in the G-2 dormitory within earshot of the fighting sounds when they were occurring.  Officer Askew claims that her testimony that she did not hear fighting sounds and that she did not witness anything unusual during her rounds is uncontroverted and therefore demands summary judgment.

Plaintiffs contrarily contend that the ongoing and loud torture, albeit intermittent, of Mr. Brown at the hands of Inmate White must have been *known* to Officer Askew because of the number of times that she was in the G-2 dorm between when the fighting started and when the doors were opened.  Plaintiffs point out that Officer Askew testified that she looks into each cell on her rounds, particularly when she must "see the body" of an inmate for her count and that she paces the floor of the dormitory between

12

rounds.   Plaintiffs contend that if Officer Askew performed her duties in accordance with her testimony, there is no way she did not know that Mr. Brown was suffering at the hands of Inmate White. Plaintiffs bolster this contention with the bloody crime scene photographs and the findings of torture in the autopsy report.

The Wade court iterated that the criminal recklessness standard for deliberate indifference requires the plaintiff to prove that the prison official *actually knew* of a substantial risk of serious harm based upon the circumstances, not just that she should have known.   16 F.4th at 1257.   Importantly, Plaintiffs' claim in this case does not rest on a "should have known" basis; rather, Plaintiffs contend that a reasonable inference may be drawn from the evidence that Officer Askew actually knew that Inmate White was beating Mr. Brown while it was happening.

Consideration of this motion comes at an opportune time since the Court has the benefit of the Honorable Adalberto J. Jordan's concurrence in the Wade case.   106 F.4th at 1262-65.   Therein, Judge Jordan emphasizes that a defendant's subjective knowledge "need not be established by direct evidence or admissions"; rather, "subjective awareness of a substantial risk of harm can be proven (or an issue of material fact created) through circumstantial evidence."   Id. at 1263.   Judge Jordan also reminds us that courts cannot make credibility determinations or weigh the evidence at summary judgment.   Id. at 1264 (stating that "testimony by a defendant that he was unaware of the plaintiff's medical condition

13

or of the risk created by his own inaction does not warrant summary judgment in his favor when that testimony is rebutted by evidence that the condition and associated risk of inaction were apparent"). Applying these concepts here, there is predictably no evidence that Officer Askew was present in the dormitory when the loud sounds of fighting were occurring nor is there evidence as to what she saw when she looked into the cell on her rounds.  It would be highly unlikely to have such direct evidence of what Officer Askew knew absent a damning admission.   Yet, there is circumstantial evidence that she did know based upon the testimony of Inmates Acosta and Pendleton, her own testimony regarding her rounds, the crime scene photographs, and the autopsy report.   Moreover, the Court cannot make a credibility determination on summary judgment and take Officer Askew's word for it that she did not observe or hear anything untoward when she made her rounds.   The question here is - is there sufficient circumstantial evidence by which a jury could reasonably determine that Officer Askew actually learned of the serious harm befalling Mr. Brown as it was happening and chose not to do anything to prevent his death?  The Court finds and determines that there is, and accordingly, a jury issue exists.

## IV.   CONCLUSION

Upon the foregoing, Defendant Askew's motion for summary judgment (doc. no. 28) is **DENIED**.   The case will proceed to trial

14

in due course on Plaintiffs' Eighth Amendment claim under 42 U.S.C. § 1983 against Officer Askew.

ORDER ENTERED at Augusta, Georgia, this 26ᵗʰ day of August, 2024.

UNITED STATES DISTRICT JUDGE

15